## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| CARRIE FOSTER, TONY FOSTER, | |
| Plaintiffs, | Civil Action No. |
| v. | 2:17-cv-278-RWS |
| MARC LOFTON, ALLAN JOHNSTON, CITY OF STATHAM, | |
| Defendants. | |

## <u>ORDER</u>

This case comes before the Court on Motions for Summary Judgment from Defendants Chief Allan Johnston and the City of Statham [Dkt. 48] and from Defendant Officer Marc Lofton [Dkt. 50] as well as Plaintiffs' Motion for Leave to File Excess Pages [Dkt. 57] and Defendants' Motion to Exclude Declarations Submitted by Plaintiffs [Dkt. 61]. As a preliminary matter, Plaintiffs' Motion for Leave to File Excess Pages [Dkt. 57] is **GRANTED**. As for the rest, the Court, after a careful review of the record, enters the following Order.

### Background

This civil rights case stems from the allegedly unlawful arrests of Plaintiff Carrie Foster and her husband Plaintiff Tony Foster by Defendant Officer Marc

Lofton. At the time of the arrests, Lofton was a police officer for the City of Statham under the supervision of Police Chief Allan Johnston. [Dkt. 48-1 at 1–2].

Before working for the City of Statham, Lofton worked for the City of Winder, where his performance reviews had been less than satisfactory [Dkt. 58-13], and where he had been put on probation for deficiencies in criminal procedure, particularly with regard to searches and seizures. [Dkt. 58-12]. Lofton was known for making a high number of DUI arrests involving alleged impairments due to drugs, rather than alcohol, even though he had not received the appropriate training to do so.[1] In fact, before coming to Statham, Lofton had previously arrested Carrie Foster for the same charge.

This time around, he arrested her, and when her husband approached the scene, Lofton tased him and arrested him too. Both spouses sued Lofton, his supervisor Chief Allan Johnston, and the City of Statham.

## 1. Carrie Foster's Arrest

On a December afternoon in 2015, Lofton initiated a traffic stop of Ms. Foster while she was driving home from her work at the local Waffle House. [Dkt. 50-2 at ¶ 37]. Lofton informed Ms. Foster that he pulled her over for speeding. [Id.;

---

[1] A number of Lofton's arrests have led to similar lawsuits before this Court.

Video 1 at 2:36]. Ms. Foster provided Lofton with a copy of a restricted license that was issued to her following a previous DUI arrest, which, incidentally, was also an arrest by Lofton. [Dkt. 48-2, ¶ 3]. Lofton observed that Ms. Foster was nervous and fidgety. [Dkt. 50-2, ¶¶ 41–42]. Lofton asked Ms. Foster if she was taking any medications, to which she replied that she took Goody's powders and Coricidin at night. [Id., ¶ 43].

Lofton then told Ms. Foster that he was "noticing a couple of things," and asked Ms. Foster to step out of her vehicle. [Dkt. 48-2, ¶¶ 6–7]. Lofton again asked Ms. Foster what medications she had taken, and again she confirmed that she took Goody's powders in the morning and Coricidin at night. [Id., ¶ 10]. Ms. Foster explained to Lofton that she had a herniated disc and a cracked hip, but she did not take any pain medication. [Dkt. 50-2, ¶ 50]. Lofton elected to perform a field sobriety test. [Video 1 at 12:51–13:13].

Lofton first performed the horizontal gaze nystagmus exercise ("HGN test"), instructing Ms. Foster to follow the tip of Lofton's pen with her eyes while not moving her head. [Dkt. 50-2, ¶ 51]. During the HGN test, Lofton allegedly observed three indicators that Ms. Foster was under the influence of drugs or alcohol: "(1) lack of smooth pursuit in both eyes, (2) distinct and sustained nystagmus at maximum deviation in both [] eyes, and (3) onset of nystagmus prior

to 45 degrees in both eyes." [Id., ¶ 53].

Lofton then instructed Ms. Foster to perform the walk-and-turn exercise. [Id., ¶ 54]. Lofton directed Ms. Foster to keep her hands by her side and to "take nine [heel-to-toe] steps, then on the ninth step, to keep her lead foot planted and take a series of small steps to rotate around and take nine heel-to-toe steps back." [Id., ¶¶ 56–57]. During the exercise, Lofton observed that Ms. Foster "had trouble balancing during the instruction stage, had to use her arms to balance, made an improper turn, and stopped while walking." [Id., ¶ 58].

Just after Ms. Foster completed the walk-and-turn exercise, Mr. Foster drove by the traffic stop on a lawnmower. [Id., ¶ 59].

Lofton then elected not to conduct a one-leg stand exercise due to Ms. Foster's expressed physical limitations. [Id., ¶ 61]. Instead, Lofton instructed Ms. Foster to perform a finger-to-nose exercise. [Dkt. 48-2, ¶ 20]. During the exercise, Lofton allegedly observed Ms. Foster miss the tip of her nose several times. [Id., ¶ 21]. Finally, Lofton instructed Ms. Foster to "recite the alphabet from letters H through Q," which she completed without deficiency. [Dkt. 50-2, ¶¶ 65–66].

Upon completion of the field sobriety tests, Lofton returned to his patrol vehicle to review his dash cam footage of the exercises and determined that Ms. Foster was "driving under the influence of some substance and was less safe to

4

drive." [Id., ¶ 67]. Lofton's microphone remained off for some time when he exited his vehicle to discuss his findings with Ms. Foster. [Video 1 at 28:35–35:29].

When Lofton's microphone came back on, he was in the middle of explaining to Ms. Foster that "what [he] was seeing" was "not normal." [Id. at 39:50–40:05]. Ms. Foster responded that she had never been able to walk straight, and that "[it was] probably because of that medicine [she] took." [Id. at 40:30–41:00]. Ms. Foster added that she "took too much of that medicine. I understand that I did and that was wrong of me." [Id. at 41:20–41:30].

Lofton then initiated the arrest of Ms. Foster, instructing her to turn around and place her hands behind her back. [Id. at 41:46]. Lofton threatened to tase Ms. Foster if she did not comply with his instructions. [Id. at 41:49–42:22]. After being handcuffed, Ms. Foster yelled to Mr. Foster, who had stopped nearby, to "get Jake . . . he's doing it again," at which point Lofton threatened to charge Ms. Foster with obstruction. [Id. at 42:40-43:20]. Ms. Foster yelled to her husband a second time while Lofton was placing her in the backseat of his patrol vehicle. [Id. at 43:04]. Ms. Foster was charged with disorderly conduct, DUI – drugs less safe, and failure to maintain lane. [Dkt. 50-2, ¶ 84].

**2. Tony Foster's Arrest**

As Ms. Foster was being placed in Lofton's patrol vehicle, Mr. Foster approached the scene of the stop and asked Lofton why Ms. Foster was being arrested. [Video 1 at 43:04–43:48]. Lofton told Mr. Foster that his wife was being arrested for a DUI and to "shut [his] mouth and leave my stop before [he goes] to jail with her." [Id.]. Mr. Foster then allegedly left the stop but mumbled that Lofton was a "dickhead." [Dkt. 46, T. Foster Dep. at 23:16–13].

Lofton then instructed Mr. Foster to turn around and to get on the ground, to which Mr. Foster replied, "I haven't done nothing." [Video 1 at 44:16–44:27]. Lofton then tased Mr. Foster, but the taser did not make a good connection and was ineffective. [Dkt. 50-2, ¶¶ 78–79]. Lofton continued to instruct Mr. Foster to "get on the ground if you don't want to get lit up again" and then tased Mr. Foster a second time. [Id., ¶ 80; Video 1 at 44:30–44:40]. Lofton then instructed Mr. Foster, who was now on the ground, to "roll over [and] put your hands behind your back, or you're going to get it again." [Video 1 at 44:52]. After a brief back and forth, Lofton deployed his taser a third time. [Dkt. 50-2, ¶ 81].

Lofton allegedly placed his knee in Mr. Foster's back and radioed to dispatch. [Dkt. 46, T. Foster Dep. at 32:24; Video 1 at 45:44–46:15]. Mr. Foster allegedly struggled to breathe and began audibly gasping for air. [Dkt. 46, T.

Foster Dep. at 34:3–9; Video 1 at 48:40]. Lofton told Mr. Foster to "keep talking to [him]" and asked Mr. Foster "how much have you had to drink?" [Video 1 at 49:20–49:38]. Mr. Foster responded that he had "one beer." [Id. at 49:39].

An ambulance appeared on scene and began tending to Mr. Foster as Lofton described the incident to the paramedics. [Id. at 53:30]. After Mr. Foster received medical attention, Lofton placed Mr. Foster under arrest. [Video 2 at 1:00]. Mr. Foster was charged with public drunkenness and obstruction. [Dkt. 50-2, ¶ 88].

## 3. Charges and Guilty Pleas

Ms. Foster, while represented by counsel, pled guilty to failure to maintain lane. [Dkt. 48-10, Ex. G]. Her remaining charges of DUI – drugs less safe and disorderly conduct were dismissed. [Dkt. 58-8, Ex. E]. Mr. Foster forfeited his bond for the public intoxication charge; his obstruction charge was dismissed. [Dkt. 48-13, Ex. J].

## 4. Procedural History

In their Complaint, the Fosters asserted various § 1983 claims: Unlawful Seizure, False Arrest, Malicious Prosecution, and First Amendment Retaliation on behalf of Ms. Foster (Counts I–IV); False Arrest, First Amendment Retaliation, and Excessive Force on behalf of Mr. Foster (Counts V–VII); and punitive damages (Count VIII). They also asserted tort claims under Georgia Law on behalf

of both Plaintiffs (Count IX).

## Discussion

## I. MOTION TO STRIKE DECLARATIONS

The Defendants moved jointly to strike three declarations [Dkts. 58-5, 58-7, 58-22] submitted by the Fosters in support of their Response to the Motion for Summary Judgment. But the reasons put forth by the Defendants for each of the three declarations do not warrant striking them. For Hilliard, [Dkt. 58-7], they argue that Plaintiffs failed to disclose him as a witness; but Hilliard was identified in the depositions, and so the Defendants should not be surprised by his inclusion. For both Ott [Dkt. 58-5] and Duffel [Dkt. 58-22], the Defendants argue that the Fosters did not properly identify them as expert witnesses. But Ott was so identified,[2] and Duffel's testimony is that of a fact witness, not an expert.

Accordingly, Defendants' Joint Motion to Exclude [Dkt. 61] is **DENIED**. The declarations will not be stricken.

---

[2] One important caveat—as Plaintiffs noted [see Dkt. 69 at 9-10], some of Ott's declaration potentially exceeds the scope of his expert report, which would be improper. But Plaintiff did not rely on that portion of the declaration, and neither does the Court.

## II. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well-established. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is improper, however, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019).

In conducting its review, the Court must "consider the record and draw all reasonable inferences in the light most favorable to the non-moving party." Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018). A court may grant summary judgment only when, after viewing all evidence in the light most favorable to the non-moving party—in a § 1983 case, typically the plaintiff—the court determines that no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. Id. at 1360.

## III. CARRIE FOSTER'S CLAIMS AGAINST OFFICER LOFTON

Ms. Carrie Foster claims that Officer Lofton unlawfully detained her, falsely arrested her, and maliciously prosecuted her, all in violation of her Fourth

Amendment rights.[3] She also makes similar claims, along with claims for assault and battery, under the applicable Georgia laws. Officer Lofton contends that the stop and arrest were lawful. He also argues that, even if his actions were not lawful, Ms. Foster's claims still fail because he is entitled to immunity and because the claims are barred by her guilty plea and conviction.

**A. Unlawful Detention**

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) (citing Illinois v. Wardlow, 528 U.S. 119 (2000)). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Id. (internal citations omitted). In particular, reasonable suspicion exists when "the officer can point to specific and articulable facts which, taken together with rational inferences from those facts support an objectively reasonable suspicion that the defendant had

---

[3] She initially brought a claim for retaliatory arrest under the First Amendment as well, but she concedes that the speech at issue occurred after she was already arrested, and so she no longer maintains that claim.

engaged in a crime." <u>Young v. Brady</u>, 2019 WL 5829507, at *3 (11th Cir. Nov. 7, 2019) (citing <u>United States v. Caraballo</u>, 595 F.3d 1214, 1222 (11th Cir. 2010)) (internal quotations omitted). "This objective justification must exist at the onset of the stop." <u>Id.</u>

However, "[a] law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." <u>Jackson</u>, 206 F.3d at 1165–66. Thus, "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had *arguable* reasonable suspicion to support an investigatory stop." <u>Id.</u> at 1166. (emphasis added). To determine whether arguable reasonable suspicion existed, a Court must "consider whether an official had reasonable suspicion as an objective question viewed from the standpoint of a reasonable official at the scene and based on the totality of the circumstances." <u>Young</u>, 2019 WL 5829507, at *3 (citing <u>Hicks v. Moore</u>, 422 F.3d 1246, 1252 (11th Cir. 2005)) (internal quotations omitted).

Here, Lofton argues that his stop of Ms. Foster was not an "unreasonable seizure" under the Fourth Amendment because he had reasonable suspicion—or at least arguable reasonable suspicion—to stop her for two different traffic violations: speeding, in violation of O.C.G.A. § 40–6–181, and failure to maintain her lane, in

violation of § 40–6–48(1).[4] But Lofton's contention is belied by the evidence in almost every respect.

As for speeding, there is a very clear fact dispute about Ms. Foster's speed. Lofton claims she was driving at 50 mph in a 45-mph zone. That, he explained to her at the time, is why he stopped her. However, beginning with her initial discussion with Lofton during the stop, which is captured on video, and continuing through her argument here, Ms. Lofton maintains that she was driving 35 mph. And she reasonably argues that she was taking care to drive cautiously, because she was already on a limited permit and because she saw the police car trailing her. Further, after having reviewed the video, Lofton ultimately declined to cite her for speeding, even as he cited her for a separate traffic violation.

The video evidence is inconclusive based on the Court's review, it does not appear that Ms. Lofton is driving particularly fast, and she does not pass any cars before being pulled over. See United States v. Latimore, 2014 WL 3109183, at *15 (N.D. Ga. July 7, 2014) (car seen passing two other vehicles). Further, she does not appear to gain ground on the car in front of her. Construing all these facts in her favor, the Court concludes that whether there was evidence of speeding to support

---

[4] Lofton argues in his brief that he had reasonable suspicion to stop her for DUI as well, but this depends only on conduct related to the two other infractions.

arguable reasonable suspicion involves a genuine dispute of fact. Summary judgment is not warranted on that basis.

The evidence for a failure to maintain lane is a closer call. Georgia law states that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." § 40–6–48(1). Lofton stated in his affidavit that he stopped Ms. Foster in part because she "crossed over" the fog line, that is, the white line that demarcates the edge of the right lane (or in this case, the only lane in that direction) from the shoulder. [Dkt. 50-3 at ¶ 88]. If Ms. Foster in fact crossed it, that would establish reasonable suspicion that she violated the statute. See Phillips v. State, 789 S.E.2d 421, 422 (Ga. Ct. App. 2016).

Lofton argues that the video shows conclusively that she crossed the line. Not so. In the video, the critical moment occurs at 0:22-24 seconds. There, for a brief moment as the road bends to the right, Ms. Foster's right tires approach and perhaps touch the right edge of the road. But upon careful review of the video, a few key facts emerge: first, the white "fog line," which is clearly present on the earlier stretch of road, stops before that point, at approximately 0:20. That means where her tires draw near to the edge, there is no highly-visible fog line against which to measure her car's position. Second, it is not conclusive that she actually

touches the edge at 0:23, when she is farthest to the right. Pausing the video reveals that there is a sliver of road visible between her tires and the edge both immediately before, at 0:22, and immediately after, at 0:24. Further, at 0:24, it appears that the spot where it looks like she touched just a second before is actually draped in shadow, so that the edge of the road is not clearly visible. Thus, a jury could reasonably conclude from the video that she did not actually touch—much less cross—the fog line.

Even if the Court were to find conclusively that the tires did touch the line, still that may not be enough. Courts in this district addressing similar stops have said that simply touching the edge of a lane, on its own, is not enough for reasonable suspicion. See United States v. Santana, 2018 WL 7283633, at *7 (N.D. Ga. Sept. 19, 2018), report and recommendation adopted, 2019 WL 365743 (N.D. Ga. Jan. 30, 2019) (citing cases).[5] There must be some other factor, like weaving

--------

[5] Indeed, it is not clear that touching the line constitutes a violation of the statute at all. See Phillips v. State, 789 S.E.2d 421, 422–23 (Ga. Ct. App. 2016). In Phillips, the court said, "The tires, at a minimum, reach the fog line, but the clarity of the video does not enable the [c]ourt to make an independent determination as to how far the tires crossed *onto and/or over* the fog line." 789 S.E.2d 421, 422 (Ga. Ct. App. 2016) (emphasis added). But in dissent, Judge McFadden noted, "It is not necessary to reach the question whether the stop could have been justified on the basis that . . . [Phillips's] tire merely touched the fog line. Phillips contends that this would not violate the relevant statute, OCGA § 40–6–48; and the state does not dispute that contention." Id. at 234–35

14

within a lane or driving at an unusual hour, to justify the stop. Id. Here, there were

no additional factors giving rise to any suspicion—except for the potential speed,

which, as noted above, cannot be definitively determined here—thus, the mere

touching of the line would not justify the stop. So, ordinarily, the Court would not

be able to conclude that Officer Lofton had even arguable reasonable suspicion to

stop Ms. Foster for failure to maintain lane.

But, there remains yet one piece of evidence that cuts against the rest: Ms.

Foster's guilty plea and subsequent conviction for failure to maintain her lane. In

Georgia, a guilty plea is considered "an admission against interest and prima facie

evidence of the facts admitted." Trustgard Ins. Co. v. Herndon, 790 S.E.2d 115,

118 (Ga. Ct. App. 2016).[6]

Ms. Foster does not dispute that the plea agreement submitted by Officer

Lofton bears her signature. But she maintains that she did not agree to plead to

---

(McFadden, J., dissenting). To use a sports metaphor, it is not apparent whether we are
playing football, where the line is out, or baseball, where the line is in.

[6] The Court applies state law to determine the preclusive effect of prior state proceedings.
Hunter v. City of Leeds, 941 F.3d 1265, 1274 (11th Cir. 2019). Notably, in Georgia,
unlike some states, the plea does not operate as a bar to subsequent civil proceedings:
Howell v. Normal Life of RI-005 Georgia, Inc., 788 S.E.2d 840, 844–45 (Ga. Ct. App.
2016) (noting that in such a case, "neither res judicata nor collateral estoppel apply"). It
does constitute relevant evidence, however. Note, this preclusive effect operates
independently of the federal rule of Heck v. Humphrey, which applies to § 1983 claims.

anything. She argues that she signed a blank piece of paper when her defense lawyer told her that everything would go away, and that he filled in the rest. She argues further that state and municipal records show that she was not actually convicted of failure to maintain lane: first, because the conviction does not appear on her driving record, and second, because the charge listed in the municipal court disposition records shows that the charge was for a county ordinance and the notes show the record was reopened at a later date. [See Dkt. 58-8 at 3].

Despite these objections, however, the Court finds that the plea agreement, which refers to failure to maintain a lane, combined with the disposition records referring to a guilty plea, preclude a factual dispute on this issue. Whatever her lawyer told her, the record shows that Ms. Foster pled guilty, and the Court must accord respect to the outcome of the state criminal proceedings. Thus, the Court considers as evidence Ms. Foster's admission that she failed to maintain her lane.

Of course, even when the underlying conduct is admitted, such an admission does not automatically wipe away potential Fourth Amendment violations. The basis for a valid conviction does not necessarily depend on what the officer knew at the time of the stop. Cf. Harvey v. United States, 681 F. App'x 850, 853–54 (11th Cir. 2017) ("[I]llegal searches may be followed by valid convictions."). So, for example, had Ms. Foster pled guilty to obstruction, the result might be

different, because the conduct for obstruction arose only after the arrest. But here, where the conduct at issue is the same conduct as that which would give rise to reasonable suspicion, the admission is necessarily controlling.

Despite some significant evidence to the contrary—evidence which would otherwise create a genuine dispute of material fact—given her admission of the underlying conduct, it cannot also be said that Officer Lofton lacked arguable reasonable suspicion to stop Ms. Foster. Therefore, he is entitled to qualified immunity for her claim of unlawful detention.

## B. Unlawful Arrest

For a claim of unlawful arrest under the Fourth Amendment, the law in this Circuit is clear: the key question is whether, at the time of the arrests, Lofton had (1) probable cause, (2) *arguable* probable cause, or (3) neither. If he had probable cause, the arrest did not violate the Fourth Amendment. See Gates v. Khokhar, 884 F.3d 1290, 1297 (11th Cir. 2018) (probable cause is an "absolute bar"). If he had only *arguable* probable cause, then qualified immunity protects Officer Lofton, even though he would have violated Ms. Foster's right. See id. at 1298. Either way, her claim fails. If, however, Officer Lofton had neither, then her claim survives.

The video shows clearly that the arrest here was for DUI, though of course, Lofton notes correctly that his immunity follows if he can show arguable probable

cause for any crime. Thus, he contends he had probable cause to arrest her not only for DUI, but also for obstruction and for the traffic violation(s) that led to the stop.

As an initial matter, his arguments about obstruction are unavailing, because the only conduct related to obstruction—namely, Ms. Foster's yelling to her husband to "get Jake"—occurred after the arrest. Her yelling probably did not rise to the level of obstruction, but even if it had, it would not justify a prior arrest.

So, the Court turns to the main crime at issue: DUI. And it is particularly problematic—if the stop was questionable, the arrest on this basis is even more so. In other cases where DUI arrests have been upheld, there are typically other factors that give the officer probable cause for the arrest: for example, a 911 report, evidence of erratic driving, driving at an unusual time of day, or some indication after the stop that alcohol had been consumed. See, e.g., Jenkins v. Gaither, 543 F. App'x 894, 898 (11th Cir. 2013). There was none of that here.

From the video, the evidence is weak. As discussed above, there is very little to quibble with about Ms. Foster's driving. Once stopped, she does not appear to be impaired. She is nervous—justifiably, particularly since she knew that Lofton had previously stopped and arrested her—but otherwise calm. She explained that she had come directly from work, and there was no reason to doubt her. And she appears to perform reasonably well with the various tests he set before her: she

appears to walk in a straight line, despite her protests about hip problems; she appears to correctly touch her nose each time except once; and she quickly states the alphabet letters Lofton requested of her. Even the most ostensibly incriminating evidence—her statements that she took too much of the medicine—can be reasonably understood, like her many apologies, as merely attempting to get the encounter over with, rather than as expressions of fact.

Officer Lofton primarily relied upon his application of the field sobriety test. And, even putting aside her performance, his administration of it is plagued with problems: the evidence shows that Lofton did not have the requisite training to test for drug impairment, that he had previously been put on notice that his knowledge in the areas of search and seizure was deficient, and that his administration of the test was incompetently performed. Under these circumstances, that she failed the test is no guarantee that even arguable probable cause existed. The test results, in this instance, are inconclusive. Cf. Strickland v. City of Dothan, AL, 399 F. Supp. 2d 1275, 1290 (M.D. Ala. 2005), aff'd sub nom. Strickland v. Summers, 210 F. App'x 983 (11th Cir. 2006) (discussing effects of incompetent testing).

Taking together all the evidence—or the lack thereof—and construing it in Ms. Foster's favor, the Court concludes that a jury could find facts warranting the conclusion that Officer Lofton lacked arguable probable cause to arrest for DUI.

There remains, however, the traffic violations. And here, the result is the same as with her claim for the unlawful stop: Ms. Foster's admission in her guilty plea that she failed to maintain her lane removes any contention that Lofton lacked probable cause, much less arguable probable cause, to arrest her for it. Indeed, the case here is even stronger than for the stop, because Lofton went back and reviewed the video before the arrest. [Dkt. 50-3 at ¶ 88]. Thus, despite evidence to the contrary, Officer Lofton is entitled to qualified immunity on Ms. Foster's claim of unlawful arrest.

**C. Malicious Prosecution**

Malicious prosecution is "a violation of the Fourth Amendment and [a] viable constitutional tort under § 1983." Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018). "To establish a federal claim for malicious prosecution under § 1983, a plaintiff must prove (1) the elements of the common-law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." Id.

Ms. Foster claims that Lofton maliciously prosecuted her by issuing to her three citations: for failure to maintain lane, for DUI, and for obstruction. She claims that, unlike with false arrest, he must have probable cause for *each* of those crimes to issue a citation. And there is some authority for that proposition. See

Elmore, 605 F. App'x at 915 ("[P]robable cause as to one charge will not bar a

malicious prosecution claim based on a second, distinct charge as to which

probable cause was lacking."); Davis v. Lang, 2016 WL 10537012, at *3 (N.D. Ga.

Dec. 7, 2016), aff'd, 706 F. App'x 551 (11th Cir. 2017) (citing Uboh v. Reno, 141

F.3d 1000, 1005 (11th Cir. 1998)) ("The difference between malicious prosecution

and false arrest is that to be entitled to qualified immunity from a malicious

prosecution claim, the officer must show that he had arguable probable cause for

each crime charged."). The rationale is that, unlike an arrest, "once an individual is

prosecuted, each additional charge imposes additional costs and burdens." Elmore,

605 F. App'x at 915.

However, malicious prosecution does not apply in cases of warrantless

arrests because the seizure is related to the arrest, not to the issuance of the

citations. Kingsland v. City of Miami, 382 F.3d 1220, 1235 (11th Cir. 2004)). The

Court addressed this very issue in a separate case involving Officer Lofton:

> Plaintiff argues that he was seized within the meaning of the Fourth
> Amendment when Officer Lofton issued a series of accusations and
> summonses that initiated legal proceedings against him. According to
> Plaintiff, the "seizure" was his arrest which was conducted pursuant to
> these charges. But to establish a Section 1983 claim for malicious
> prosecution, the deprivation of liberty—the seizure—must have been
> effected pursuant to legal process. Ordinarily, this legal process will
> be either in the form of a warrant, in which case the arrest itself may
> constitute the seizure, or a subsequent arraignment, in which case any
> post-arraignment deprivations of liberty (such as being bound-over for

trial) might satisfy this constitutional requirement. In the case of a
warrantless arrest, the judicial proceeding does not begin until the
party is arraigned or indicted. Thus, the plaintiff's arrest cannot serve
as the predicate deprivation of liberty because it occurred prior to the
time of arraignment and was not one that arose from malicious
prosecution as opposed to false arrest.

Hardigree v. Lofton, 2019 WL 3425933, at *17 (N.D. Ga. July 30, 2019) (citing

Kingsland, 382 F.3d at 1235) (internal citations and quotations omitted).

Accordingly, Ms. Foster cannot maintain a claim for malicious prosecution.

### D. State Law Claims

Under Georgia law, an officer is immune "from personal liability arising

from his performance of official functions as long as the officer did not act with

actual malice or actual intent to cause injury." Gates v. Khokhar, 884 F.3d 1290,

1304 (11th Cir. 2018) (internal quotations omitted). Both actual malice and actual

intent to cause injury are high standards:

The Georgia Supreme Court has defined actual malice in this context
to mean a deliberate intention to do wrong. As such, actual malice is
not established merely by showing that the defendant acted with ill
will. Nor does actual malice encompass merely the reckless disregard
for the rights and safety of others. Likewise, the phrase actual intent to
cause injury—as used in Georgia's official immunity provision—
means an actual intent to cause harm to the plaintiff, not merely an
intent to do the act purportedly resulting in the claimed injury.

Id. (internal citations and quotations omitted); see also Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (neither "unreasonable conduct" nor "recklessly illegal conduct" support an inference of actual malice).

Ms. Foster argues that the evidence here allows for an inference of actual malice because the arrests were without probable cause. The Court concluded above that due to Ms. Foster's admission in her guilty plea, Lofton did have probable cause, which would defeat her contention. But even if he did not, the mere lack of probable cause would not suffice to establish actual malice. Ms. Foster points to the case of City of Atlanta v. Shavers, but that case allowed for an inference of malice when the officer affirmatively knew that no crime had been committed. 756 S.E.2d 204, 205–06 (Ga. Ct. App. 2014) (officer saw video showing that no crime had been committed but arrested plaintiff anyway). Affirmatively knowing a crime has not been committed is not the same as lacking probable cause. And while it is true that a total lack of probable cause may satisfy the element of malice for a malicious prosecution charge, it does not establish that the officer acted with *actual* malice for purposes of immunity. See Marshall v. Browning, 712 S.E.2d 71, 73–74 (Ga. Ct. App. 2011).

So, the Court concludes that Officer Lofton did not act with actual malice. The facts in the record do not create a jury question concerning whether he had

actual malice toward or an actual intent to injure Ms. Foster. Therefore, Lofton is entitled to official immunity for her claims under state law.

Based on the foregoing, the Court concludes that Officer Lofton is entitled to immunity for both the federal[7] and state law claims brought by Ms. Foster against him.[8] Accordingly, summary judgment is **GRANTED** as to those claims. They are hereby **DISMISSED**.

## IV. TONY FOSTER'S CLAIMS AGAINST OFFICER LOFTON

Mr. Tony Foster claims that Officer Lofton arrested him in violation of his Fourth and First Amendment rights and used excessive force during the arrest. He also makes the same state law claims as does his wife. Officer Lofton raises the same defenses: he contends that his conduct was lawful, and, even if not, the claims still fail because he is still entitled to immunity and because Mr. Foster is barred from bringing these claims.

---

[7] Because the Court determines that Officer Lofton was entitled to immunity, it does not reach the question of whether the claims are barred under the rule of <u>Heck v. Humphrey</u>.

[8] Even though Lofton did not expressly challenge the punitive damage claim (Count VIII) in his briefs, that claim necessarily fails against him as well.

### A. Unlawful Arrest

Officer Lofton contends that he had arguable probable cause to arrest Mr. Foster for both public intoxication and obstruction.[9] The Court disagrees.

Based on the audio evidence from the video,[10] Officer Lofton did not have arguable probable cause to arrest Mr. Foster for public intoxication, because the only significant evidence of any drinking arises *after* the arrest. Over two minutes after Lofton first ordered Foster onto the ground, after he had tased him multiple times, only then does Officer Lofton ask whether he had been drinking. Lofton argues he had earlier evidence justifying the arrest because of his "demeanor" and the "smell of alcohol." [Dkt. 50-1 at 15]. But to the extent these factors could justify an arrest, they are hotly disputed questions of fact. The audio evidence, it must be said, supports Mr. Foster's position that he was not acting in a manner indicating drunkenness.

Lofton again raises the issue of the preclusive effect of Mr. Foster's conviction. But the argument is unavailing here. Again, the rule in Georgia is that a

---

[9] Again, the video makes clear that the *subjective* basis for the stop was what Mr. Foster said to Officer Lofton. But the test is an objective one, and so the Court considers whether Lofton had arguable probable cause to arrest for any crime.

[10] The entire interaction with Mr. Foster occurs offscreen.

guilty plea is "an admission against interest and prima facie evidence of the facts admitted." Trustgard Ins. Co. v. Herndon, 790 S.E.2d 115, 118 (Ga. Ct. App. 2016). And Georgia law similarly treats a bond forfeiture as an admission. See United States v. Daniel, 358 F. App'x 79, 82 (11th Cir. 2009) ("Georgia bond forfeitures are generally considered convictions under the sentencing guidelines because they are admissions of guilt."). So, as with his wife's case, the Court must consider as evidence that Mr. Foster admits to public intoxication.

Unlike with Ms. Foster's plea, however, Mr. Foster's admission does not retroactively give rise to arguable probable cause for the arrest. That is because the evidence of the admission is rebutted by the other evidence, which shows that the key information concerning public intoxication—Mr. Foster's statement—arose after Lofton had arrested him. Therefore, the Court cannot conclude as a matter of law that Officer Lofton had arguable probable cause to arrest Mr. Foster for public intoxication.

The undisputed facts likewise do not support the conclusion that Officer Lofton had arguable probable cause to arrest Mr. Foster for obstruction. Mr. Foster did not obstruct Lofton's arrest of Ms. Foster in any way. See Merenda v. Tabor, 506 F. App'x 862, 867 (11th Cir. 2013) (citing Skop v. City of Atlanta, GA, 485 F.3d 1130, 1139 (11th Cir. 2007)) ("There is also no evidence in the record that

Merenda in any way obstructed Tabor from writing the traffic citation for his daughter. Inquiring into what an officer is doing does not constitute obstruction."); see also Reese v. Herbert, 527 F.3d 1253, 1272–73 (11th Cir. 2008) (no arguable probable cause when plaintiff stood near a scene and approached officers after they had arrested other person). It is true that Mr. Foster called Officer Lofton a "dickhead" as he was walking away, but neither the epithet nor leaving the scene constitutes obstruction. See Merenda, 506 F. App'x at 867.[11]

---

[11] Indeed, Merenda is particularly instructive because the facts are very similar:

> On December 24, 2008, Tabor pulled over Merenda's daughter in the parking lot of the nursing home in Perry, Georgia where Merenda worked and wrote her a ticket for wearing her seatbelt improperly. Merenda came outside and attempted to convince Tabor not to write the ticket. The video recorder from Tabor's squad car recorded most of the exchange between Merenda and Tabor. Merenda observed that wearing a seatbelt under one arm was a minor infraction, but Tabor persisted. Merenda then said, "this sucks," and, as he was turning to walk away from Tabor, said, "You're a fucking asshole." The verbal exchange between Merenda and Tabor was picked up on the patrol car's recorder, but Merenda's epithet is barely audible, either because he was turned away from the microphones as he said it, because he spoke softly, or both.

> As Merenda walked quickly away from Tabor, Tabor attempted to stop him, twice telling him "come here." When Merenda did not stop, Tabor left his patrol car to catch up with him. Tabor said, "sir," and Merenda turned around. Tabor instructed Merenda to put his hands behind his back. Merenda repeatedly asked why. As Tabor pulled Merenda's hands behind his back, Merenda held his arms stiffly, which Tabor considered threatening. Tabor put Merenda in a choke hold and bent him over the trunk of the car. He handcuffed Merenda and put him in the back of his patrol car.

506 F. App'x at 866.

Lofton fails to distinguish <u>Reese</u>, and when he argues that his case is instead like that of <u>Lebis v. State</u>, 808 S.E.2d 724, 734 (Ga. 2017), his comparison misses the mark. First, the comparison Lofton draws is to a situation where an officer was tending to another officer who had been shot. <u>Id.</u> (obstruction when the defendant was "hindering Officer Brown by diverting his attention from performing life saving efforts on wounded Officer Sean Callahan"). He contends that his situation is the same because Mr. Foster "forced him to hastily place Ms. Foster in the back of the car." [Dkt. 64 at 11]. Not only is the analogy a bad one, but Lofton's characterization of the encounter is not necessarily supported by the evidence.

Second, Lofton's comparison overlooks a much more comparable encounter in the same case. In <u>Lebis</u>, the defendant was charged with multiple counts of obstruction—only one of which Lofton referenced. In another of the Counts, Lebis was charged with obstruction for yelling at the officers to leave her husband alone when they were arresting her. <u>Lebis</u>, 808 S.E.2d at 734. Then-Justice Grant, writing for the Georgia Supreme Court, reversed her conviction, holding that simply yelling at them did not amount to obstruction. <u>Id.</u> ("The fact that Lebis was 'not assisting' with the arrest in this case when she yelled at officers to leave Tremaine alone, without anything more, did not rise to the level of obstruction").

Among the different obstruction charges addressed in <u>Lebis,</u> this one much more closely resembles the facts here than does the one cited by Lofton.

Considering these authorities and construing the facts of this case most favorably to Mr. Foster, the Court cannot conclude that Officer Lofton had arguable probable cause to arrest him for obstruction either. Accordingly, without justification to arrest for either crime, Lofton is not entitled to qualified immunity for that claim.

## B. Retaliatory Arrest

Mr. Foster also claims that he was arrested not for any crime, but because he called Officer Lofton a "dickhead." He argues that the arrest was unlawful retaliation in violation of his First Amendment right to free speech. "To establish a First Amendment claim, a plaintiff must show first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." <u>Merenda v. Tabor</u>, 506 F. App'x 862, 867–68 (11th Cir. 2013) (citing <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250 (11th Cir.2005)).

Those elements appear to be easily satisfied here. Plaintiff called Officer Lofton a "dickhead," and given that he was arrested immediately after for no

apparent criminal conduct, there is evidence that it was the statement that caused the arrest. See id. (violation of First Amendment when officer arrested plaintiff for calling him a "fucking asshole"). Indeed, Lofton does not really argue for judgment based on these elements.

Instead, the parties chiefly disagree about whether probable cause—or arguable probable cause—bars this First Amendment claim. Lofton argues that arguable probable cause bars this claim just like the last one. Mr. Foster argues that, even if Lofton had arguable probable cause to arrest him, still his arrest could violate the First Amendment. As it happens, the Supreme Court recently answered this very question: it held that, barring one exception which does not apply here, the plaintiff is required to show that the officer lacked probable cause. Nieves v. Bartlett, 139 S. Ct. 1715, 1724 (2019).

In any event, though Lofton correctly identifies the contours of the First Amendment claim, it is for him no defense, because the Court has already established that he lacked arguable probable cause. Because of that, and because the elements of the First Amendment claim are met, he is not entitled to qualified immunity on the First Amendment claim either.

### C. Excessive Force

Mr. Foster claims that Officer Lofton used excessive force when he tased him multiple times while arresting him. A claim of excessive force "presents a discrete constitutional violation relating to the manner in which an arrest was carried out." <u>Bashir v. Rockdale Cty., Ga.</u>, 445 F.3d 1323, 1332 (11th Cir. 2006). The claim is "independent of whether law enforcement had the power to arrest" in the first place. <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th Cir. 2008).

Of course, when an arrest is made in the absence of probable cause, an officer is not justified in using *any* force. <u>See</u> <u>Reese v. Herbert</u>, 527 F.3d 1253, 1273 (11th Cir. 2008); <u>Bashir</u>, 445 F.3d at 1332 ("[I]f an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest."). That is because "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." <u>Reese</u>, 527 F.3d at 1272.

But in such a case, the "claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." <u>Bashir</u>, 445 F.3d at 1331. An excessive force claim premised only on the lack of probable cause would be dismissed. <u>Id.</u>; <u>Compare</u> <u>Andrews v. Scott</u>, 729 F. App'x 804, 810 (11th Cir. 2018) ("Here, Andrews does

not predicate her excessive force claim solely on the allegation that Officer Marshall and Sergeant Kizzire lacked the authority to arrest her."), with Derowitsch v. Granger, 783 F. App'x 979, 985 (11th Cir. 2019) ("Plaintiffs' excessive force claim is predicated solely on allegations that Defendants lacked probable cause or arguable probable cause to arrest Plaintiffs.").

So, although the evidence shows that Officer Lofton lacked arguable probable cause to arrest Mr. Foster, the Court assumes for the purposes of this claim that he did have probable cause and considers whether his repeated use of the taser to subdue Mr. Foster while arresting him for obstruction and public intoxication would nevertheless be excessive.

In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008). Various factors guide that determination: "(1) the severity of the crime; (2) whether the individual poses an immediate threat to the safety of the officers or others; (3) whether the individual actively resists or tries to evade arrest by flight; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury. Hinson v. Bias, 927 F.3d 1103, 1117 (11th Cir. 2019) (internal citations omitted).

So considered, the Eleventh Circuit has clearly established that when a suspect arrested for minor crimes resists an officer without violence, the use of a taser is excessive. See id. at 1289–90. As the court explained, "Disorderly conduct is not a serious offense. Similarly, resisting arrest without violence does not connote a level of dangerousness that would justify a greater use of force." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011). The same might be said for public intoxication. A taser might be appropriate when the "officer reasonably believes the suspect is violent," but otherwise, the use of the taser for such arrests violates the arrestee's Fourth Amendment rights. Id. at 1289–90.

Construing the evidence most favorably to Mr. Foster, it does not appear that he was acting in a violent manner. Foster contends that he "began complying with Officer Lofton's order" right away and he was "in the process of reaching his hands behind him" when Lofton put a knee in his back and then, without warning, tased him. [Dkt. 58 at 38–39]. The audio supports his position that he was walking away from Officer Lofton and that he was tased before he had a proper opportunity to comply with his commands.

Therefore, in light of the evidence presented and clearly-established precedent set out by the Eleventh Circuit, Officer Lofton is not entitled to qualified immunity on Mr. Foster's excessive force claim at this stage.

**D. Heck v. Humphrey**

Because Officer Lofton is not entitled to qualified immunity for Mr. Foster's § 1983 claims, the Court now turns to Lofton's other defense. He also argues that the Supreme Court's rule from Heck v. Humphrey bars Mr. Foster's § 1983 claims here. In Heck, the Court explained the rule:

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed[.]

512 U.S. 477, 487 (1994). Lofton argues that Mr. Foster's § 1983 action would necessarily imply the invalidity of his conviction for public intoxication, and so the claims must be dismissed. Mr. Foster argues in response that his bond forfeiture does not constitute a "conviction" under the rule. In fact, neither is correct.

First, while Mr. Foster is correct that some methods of terminating criminal proceedings do not count as a conviction, see McClish v. Nugent, 483 F.3d 1231, 1251 (11th Cir. 2007) (pre-trial intervention program not a conviction), as noted above, that is not the case for bond forfeitures, which are treated as such. United States v. Daniel, 358 F. App'x 79, 82 (11th Cir. 2009) (citing O.C.G.A. § 40-13-

58) ("Georgia bond forfeitures are generally considered convictions under the sentencing guidelines because they are admissions of guilt.").

But the question of Mr. Foster's "conviction" operating as a potential bar points to a larger, deeper issue—namely, that Heck may not apply at all to cases involving non-prisoners. Heck, of course, involved a case at the "intersection" of § 1983 and the federal habeas statute, which provides a form of relief for *prisoners*. Many courts—and a few justices—have concluded that Heck does not apply at all in a case like this, where the § 1983 plaintiffs are not incarcerated such that habeas is not a viable remedy. See Spencer v. Kemna, 523 U.S. 1, 21 (1998) (Souter, J., concurring) ("The better view, then, is that a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy."). The issue, which is currently being debated among the different circuits, was expressly left unresolved by the Eleventh Circuit. Topa v. Melendez, 739 F. App'x 516, 519 n.2 (11th Cir. 2018). The Court there noted that existing circuit precedent supports the different, conflicting positions. Id.

This Court believes that the correct approach is to limit Heck to cases in which a non-prisoner had a meaningful opportunity to bring a habeas claim while

incarcerated. See Morrow v. Fed. Bureau of Prisons, 610 F.3d 1271, 1272 (11th Cir. 2010) ("This case is one in which the alleged length of unlawful imprisonment—10 days—is obviously of a duration that a petition for habeas relief could not have been filed and granted while Plaintiff was unlawfully in custody."). However, the Court—like the Eleventh Circuit—need not resolve that issue here. That is because Heck does not apply here, albeit for a different reason.

Similar to the state law preclusion analysis, the Heck challenge fails because, on these facts, Mr. Foster's claims would not "necessarily imply" the invalidity of his alleged conviction. As noted above, the only significant evidence evincing public intoxication—which is the crime for which Mr. Foster forfeited his bond—was discovered *after* Officer Lofton arrested and tased him. That is when Officer Lofton first asked him if he had been drinking.

This case illustrates what the Eleventh Circuit meant when it said, "a successful § 1983 action for search and seizure violations does not necessarily imply that a conviction is invalid." Harvey v. United States, 681 F. App'x 850, 853–54 (11th Cir. 2017) (citing Hughes v. Lott, 350 F.3d 1157, 1160 (11th Cir. 2003)). The Fourth Amendment claims here—particularly the claim for excessive force, see Dyer v. Lee, 488 F.3d 876, 879 (11th Cir. 2007)—have nothing to say

about the validity of the *conviction* for public intoxication; only for the arrest. Thus, <u>Heck</u> does not bar Mr. Foster's § 1983 claims.

### E. State Law Claims

Again, for the claims brought under state law, Officer Lofton would be entitled to immunity unless the plaintiffs could show he acted with "actual malice or actual intent to cause injury." <u>Gates v. Khokhar</u>, 884 F.3d 1290, 1304 (11th Cir. 2018). Those are high standards. Mr. Foster must show more than the mere lack of arguable probable cause to meet either. <u>See</u> <u>Marshall v. Browning</u>, 712 S.E.2d 71, 73–74 (Ga. Ct. App. 2011). But in this case, he can meet that burden.

Unlike with the stop and arrest of Ms. Foster, the evidence of Officer Lofton's treatment of Mr. Foster, construed in Mr. Foster's favor, is enough. Lofton was clearly provoked by being called a "dickhead;" his repeated and excessive use of the taser, despite Mr. Foster's repeated claims that he had done nothing wrong, and no apparent threat of harm against Officer Lofton, could be viewed as the product of an actual intent to harm Mr. Foster. A jury may well review the evidence and determine that he acted with the requisite state of mind. Accordingly, Officer Lofton is not entitled to official immunity at this stage.

Accordingly, his Motion for Summary Judgment is **DENIED** as to those claims.[12] They will proceed to trial.

## V. CLAIMS AGAINST CHIEF JOHNSTON

In addition to the claims against Officer Lofton, both Tony and Carrie Foster also sued Chief Allan Johnston in his individual capacity.[13] Chief Johnston is not a defendant to all claims; in the Complaint, he is excluded from the state law claims (Count IX) and from Mr. Foster's claims for First Amendment retaliation and for excessive force (Counts VI and VII).

In their Response to Summary Judgment, the Fosters narrow the scope further, focusing nearly exclusively on the claim concerning Ms. Foster's arrest for DUI. As they put it, "the question for . . . supervisory liability . . . is whether Johnston was deliberately indifferent to a serious risk of harm *posted by Lofton's DUI practices in light of his training*." [Dkt. 58 at 49 (emphasis added)]. Indeed, proceeding from there, the argument raises numerous issues about Lofton's DUI arrest practices, of which Chief Johnston was allegedly aware. See id. at 50–57.

---

[12] Lofton did not discuss the punitive damages claim (Count VIII) in his briefs supporting summary judgment. Therefore, that claim will remain as well.

[13] The Fosters originally sued Johnson in his official capacity as well as his individual capacity. But the official capacity claim was dismissed because the City was also named as a Defendant. [See Dkt. 19].

So, in practice, while he is technically a defendant for the claims of unlawful stop (Count I), Malicious Prosecution (Count III) and Mr. Foster's claim of false arrest (Count V), the claim against Johnston really centers on the arrest for DUI.[14] That focus is sensible, considering what the evidence shows, but, given the Court's determination in the sections above, it also means that the claims against Officer Johnston must fail.

The supervisor cannot be liable under § 1983 if the arresting officer had actual or arguable probable cause to arrest. See Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 821 (11th Cir. 2017) (no "supervisory liability when there is no underlying constitutional violation"); Dukes v. Deaton, 852 F.3d 1035, 1045–46 (11th Cir. 2017) ("A supervisor cannot be liable for the constitutional violation of his subordinate if the constitutional violation was not then clearly established."). In a sense, Officer Lofton's liability is a precondition for Chief Johnston's. And while there was a genuine issue of material fact about whether Lofton lacked arguable probable cause to arrest Ms. Foster *for DUI*, the Court held

---

[14] Chief Johnston argues that the Fosters waived their claims to punitive damages (Count VIII) by not addressing them in their Response. But this is not quite right—at the very end, the Fosters' Response alludes to punitive damages in a footnote. [Dkt. 58 at 58 n.43]. But they do so by linking the analysis to the same analysis as the DUI arrest claims. So the broader point remains—the claim clearly centers on the DUI arrest.

that Officer Lofton had arguable probable cause to arrest her for another crime. That defeated her claim against Officer Lofton; it likewise defeats her claims against his supervisor.

As for the remaining, unaddressed claims for which Chief Johnston is a defendant, the necessary causal connection is lacking. "To hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." Keith v. DeKalb Cty., Georgia, 749 F.3d 1034, 1047–48 (11th Cir. 2014). The Fosters do not purport to establish any causal connection between the evidence concerning what was known about Officer Lofton's DUI practices and Lofton's arrest of Mr. Foster for public intoxication or obstruction.

As a result, Chief Johnston cannot be held liable for any of the claims. His Motion is therefore **GRANTED**. The claims against him are hereby **DISMISSED**. The Clerk is directed to dismiss him from this case.

## VI. CLAIMS AGAINST THE CITY OF STATHAM

Finally, there are the claims against the City of Statham. As with the Chief, the City is not a defendant to all claims. In particular, as with the Chief, the City is not a defendant for Mr. Foster's claims of First Amendment retaliation or of

excessive force (Counts VI and VII). Additionally, whereas the Chief was a defendant to the punitive damages claim (Count VIII,) the city is not;[15] instead, it is a defendant to the state law claims (Count IX).

As for the federal claims, the parties correctly recognize that the liability for a municipality is governed by <u>Monell</u> and its progeny. <u>See</u> <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978). Yet, the outcome follows much as it did for Chief Johnston. Because the Fosters raised the same issues for the City as with the Chief, the Court's focus again centers on the propriety of Ms. Foster's arrest for DUI. And again, because the Court found that Officer Lofton had probable cause to arrest her, there was no constitutional violation for which the City would be subject to liability under § 1983.[16] The claims against the city

---

[15] Municipalities are of course immune from punitive damage claims under § 1983. <u>See</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981).

[16] As a general matter, municipal liability should be addressed separately from supervisory liability, because its contours differ from that of the liability of individuals, even if it looks at much of the same evidence. <u>Saunders v. Sheriff of Brevard Cty.</u>, 735 F. App'x 559, 563 (11th Cir. 2018) ("[T]hese forms of liability are subject to different standards.") Notably, municipalities are not entitled to qualified immunity. <u>Davis v. City of Apopka</u>, 734 F. App'x 616, 621 (11th Cir. 2018) (citing <u>Owen v. City of Indep.</u>, 445 U.S. 622, 638 (1980)). Thus for Fourth Amendment claims, that means that the Court uses the *actual* probable cause standard, rather than the *arguable* probable cause standard, because the latter is specific to qualified immunity. <u>Id.</u> at 620–21. If an Officer had arguable probable cause but not actual probable cause, it is possible that the municipality could be liable, even if the officer could not. But when the officer, as here,

41

excessive force (Counts VI and VII). Additionally, whereas the Chief was a defendant to the punitive damages claim (Count VIII,) the city is not;[15] instead, it is a defendant to the state law claims (Count IX).

As for the federal claims, the parties correctly recognize that the liability for a municipality is governed by <u>Monell</u> and its progeny. <u>See</u> <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978). Yet, the outcome follows much as it did for Chief Johnston. Because the Fosters raised the same issues for the City as with the Chief, the Court's focus again centers on the propriety of Ms. Foster's arrest for DUI. And again, because the Court found that Officer Lofton had probable cause to arrest her, there was no constitutional violation for which the City would be subject to liability under § 1983.[16] The claims against the city

---

[15] Municipalities are of course immune from punitive damage claims under § 1983. <u>See</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981).

[16] As a general matter, municipal liability should be addressed separately from supervisory liability, because its contours differ from that of the liability of individuals, even if it looks at much of the same evidence. <u>Saunders v. Sheriff of Brevard Cty.</u>, 735 F. App'x 559, 563 (11th Cir. 2018) ("[T]hese forms of liability are subject to different standards.") Notably, municipalities are not entitled to qualified immunity. <u>Davis v. City of Apopka</u>, 734 F. App'x 616, 621 (11th Cir. 2018) (citing <u>Owen v. City of Indep.</u>, 445 U.S. 622, 638 (1980)). Thus for Fourth Amendment claims, that means that the Court uses the *actual* probable cause standard, rather than the *arguable* probable cause standard, because the latter is specific to qualified immunity. <u>Id.</u> at 620–21. If an Officer had arguable probable cause but not actual probable cause, it is possible that the municipality could be liable, even if the officer could not. But when the officer, as here,

necessarily fail. See Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 821 (11th Cir. 2017) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation.").

The state law claims can also be disposed of quickly. The City argues both that the Fosters waived those claims against the City by not addressing them in their Response and that, even if treated on the merits, the City still prevails, because Georgia law precludes such a claim against it. It is right on both accounts. Under Georgia statutory law, "A municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law." O.C.G.A. § 36-33-3. Perhaps because the law is straightforward, the Fosters did not respond to this particular argument raised by the City. Accordingly, the state law claims against the City cannot be maintained.

Therefore, the City of Statham's Motion is **GRANTED**. The claims against the City are **DISMISSED**. The Clerk is directed to dismiss the City as a party.

---

had actual probable cause, there is no constitutional violation in the first instance, and so the analysis for the municipality mirrors that of the supervisor.

**Conclusion**

Defendants Johnston and City of Statham's Motion for Summary Judgment [Dkt. 48] is **GRANTED**. Defendant Lofton's Motion for Summary Judgment [Dkt. 50] is **GRANTED in part and DENIED in part**. Plaintiffs' Motion for Leave to File Excess Pages [Dkt. 57] is **GRANTED**. Defendants' Motion to Exclude Declarations [Dkt. 61] is **DENIED**. The case will proceed to trial on Plaintiff Tony Foster's claims against Defendant Officer Lofton. The Clerk is directed to dismiss the other parties from the case. The remaining parties shall submit a proposed consolidated pretrial order within 30 days.

**SO ORDERED** this 16th day of January, 2020.

_____
**RICHARD W. STORY**
United States District Judge